Filed 3/7/16  P. v. Lopez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067393 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD254543) |
| ERNESTO LOPEZ, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Affirmed.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Randall Einhorn and Stacy Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Ernesto Lopez, Jr. of attempted murder and assault by means of force likely to produce great bodily injury.  The jury found the attempted murder was willful, deliberate and premeditated.  The jury also found true allegations as to both

counts that Lopez used a deadly and dangerous weapon, a knife, and personally inflicted great bodily injury upon the victim, Ivan Rivas.  Lopez appeals, contending there is insufficient evidence to support the jury's finding that the attempted murder was willful, deliberate and premeditated.  We affirm.

Lopez also filed a petition for writ of habeas corpus (*In re Ernesto Lopez, Jr.* (D068948)), which we ordered considered with this appeal.  We deny the petition by separate order.  We also deny Lopez's motion to consolidate the appeal with the petition.

FACTUAL BACKGROUND

In February 2014, Lopez, whose nickname was Boonie, and his next-door neighbor, Brittnie Ross, were involved in a dating relationship.  (Undesignated date references are to the year 2014.)  They broke up on February 10.  Lopez spent the next day in Tijuana, Mexico.  That same day, Ross had gone to a restaurant where Lopez and Rivas both worked.  Eventually, Ross and Rivas went to Ross's house where they danced and drank vodka together.  Rivas became very intoxicated and fell asleep on the couch.  Rivas believed he may have kissed Ross but did not remember any other physical intimacy.

Lopez arrived at the house he shared with his parents around 2:30 a.m. that night.  He received several text messages from Ross.  One message read, "I wish you were in bed with me right now instead of this random person."  Lopez texted back, "whatever."  He then got another message from Ross, stating "what's really fucked up is that you know him."  Lopez was aggravated by Ross's first message and became very upset by the second.

2

Around 3:00 a.m., Lopez's father heard him leave the house and thought he sounded upset. Lopez's mother asked him where he was going and Lopez responded, "I'll be right back, mother." She thought he sounded calm and normal.

Early that morning, Ross's roommate, Danica Bonner, heard glass breaking and then 90 seconds to two minutes later, she heard Ross scream, "Boonie, no" and "Boonie, stop it." Bonner went to Ross's room and saw a man on the floor bleeding. Bonner called 911.

When police and paramedics arrived, they found Rivas in the bedroom with multiple wounds. He had nine stab wounds, which included injuries to his liver, intestines, bladder, and colon. Although he did not suffer fatal injuries, Rivas underwent multiple surgeries and had long-term health complications from the incident. The front door to Ross's house had been broken off the door jamb and the glass on it shattered.

A few weeks later, the United States Fugitive Task Force apprehended Lopez in Mexico. After he was transferred to the San Diego Police Department, Lopez told an officer that Ross's text message angered him so he "smashed in there and handled his shit." Lopez admitted that he stabbed Rivas with a knife he found in Ross's bedroom. Lopez told the officer he threw the knife out of the car window when he fled.

Lopez's mother stated that she only had small knives in her house because she did not like knives and did not use them. However, a detective who searched the Lopez home after the stabbing testified that he found a drawer with multiple knives, including large ones. Bonner testified that she was responsible for cleaning the house she shared

3

with Ross, including cleaning Ross's room from "top to bottom" and Bonner was certain that Ross did not keep a knife in the bedroom.

*Defense*

Lopez testified on his own behalf. He stated that on February 11, he went to Tijuana to see his brother. Lopez and his brother engaged in a physical altercation. When he returned to the United States, Lopez was emotional and under the influence of alcohol, Xanax, cocaine and methamphetamine.

Lopez testified that Ross's text messages made him feel "betrayed in a way" and "curious" about the man Ross was with. Thus, Lopez went to Ross's house "to check out who was in there." Lopez forced his way into Ross's house by breaking the front door, which was typically difficult to open. He kicked the door several times and had to use quite a bit of force to get it open. Lopez denied going to Ross's house intending to kill her companion.

When he entered Ross's bedroom, Lopez saw a man who "seemed familiar." Lopez admitted stabbing Rivas, but did not have a specific recollection of the incident because he was in shock and everything happened quickly. Lopez claimed he was provoked by Ross's text messages and "something just took over [him] and [he] just acted." According to Lopez, anyone in his situation would have done the same thing. He further explained that "it's not just, 'oh, I got provoked. I'm jealous. I'm going to go stab [Rivas].' It's not that." Rather, Lopez stated he was in a bad mood from other things that occurred over the years.

4

DISCUSSION

I. *Standard of Review*

"We do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation." (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462-1463, fn. 8 (*Herrera*).) " 'Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and all logical inferences from that evidence . . . . Settled principles of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt.' " (*Id.* at p. 1463.)

Further, it is the exclusive function of the trier of fact to assess the credibility of witnesses. (*People v. Alcala* (1984) 36 Cal.3d 604, 623; *People v. Lopez* (1982) 131 Cal.App.3d 565, 571.) We will "not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; see also *People v. McLead* (1990) 225 Cal.App.3d 906, 917.) It is not our function to reweigh the evidence. (*People v. Perry* (1972) 7 Cal.3d 756, 785.) Thus, a judgment will not be overturned even if we might have made contrary findings or drawn different inferences, as "[i]t is the jury, not the appellate court, that must be convinced beyond a reasonable doubt." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

## II. *Sufficiency of the Evidence*

Lopez contends there is insufficient evidence to support the jury's finding that the attempted murder was willful, deliberate and premeditated. We reject this argument.

The crime of attempted murder requires proof of the specific intent to kill coupled with the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) For purposes of sentence enhancement, the prosecution may seek a jury finding that an attempted murder was willful, deliberate, and premeditated. (Pen. Code, § 664, subd. (a)); *People v. Bright* (1996) 12 Cal.4th 652, 669.)

There are "three categories of evidence for a reviewing court to consider with respect to premeditation and deliberation: (1) prior planning activity; (2) motive; and (3) the manner of killing. These factors are 'not a sin qua non to finding first degree premeditated murder, nor are they exclusive.' " (*Herrera*, *supra*, 70 Cal.App.4th at pp. 1462-1463, fn. omitted.) " ' "When evidence of all three categories is not present, 'we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' " ' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1253.) Further, "[p]remeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People v. Memro* (1995) 11 Cal.4th 786, 863.)

6

Here, the jury could have reasonably found that Lopez had a motive to kill Rivas. After receiving Ross's text messages about being in bed with another man, Lopez felt betrayed and upset. As a result, Lopez decided to "handle [Rivas's] shit." This evidence was sufficient for a motive finding.

The jury could also have reasonably found that Lopez was deliberate in his manner of killing. There was no evidence of a struggle. Rather, the evidence showed that Rivas was passed out when Lopez marched into Ross's home and stabbed Rivas nine times. Lopez continued to stab Rivas despite Ross's demands for Lopez to stop. Rivas had injuries to his liver, intestines, bladder, and colon. The wounds were deep enough that Rivas's intestines began to protrude from one of the puncture wounds on his abdomen. (See *People v. Pride* (1992) 3 Cal.4th 195, 247 ["A violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation."].)

Lastly, contrary to Lopez's argument, the jury could also have reasonably found Lopez planned to kill Rivas. The evidence showed that Lopez left his house to find out who Ross was with, kicked Ross's front door repeatedly with force to gain entry, and obtained a knife before stabbing Rivas nine times. (See *People v. Millwee* (1998) 18 Cal.4th 96, 134 [protracted and elaborate planning activity is not required for finding of sufficient evidence of premeditation].) Lopez contends there was no evidence that he armed himself with a knife before he entered Ross's house. Although there was conflicting evidence about where Lopez obtained the knife, the jury could have reasonably inferred that Lopez brought the knife with him to Ross's home. Lopez told

7

officers that he found the knife in Ross's bedroom and testified that it just "popped" into his hand. His mother claimed she did not like knives and only had small ones. An officer, however, found a kitchen drawer full of cutting utensils, including large knives, in the Lopez home. Further, Bonner, who was responsible for cleaning Ross's room and claimed to do a thorough job at it, testified that she had never seen a knife in Ross's bedroom. Lopez also confirmed that he had never seen a weapon in Ross's room. The jury was entitled to discredit Lopez's and his mother's testimony. While the evidence may have supported a contrary finding, it is not our role to reweigh the evidence where the circumstances reasonably justify the trier of fact's findings. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

Based on the foregoing, we conclude there was substantial evidence to support the jury's finding of willfulness, premeditation and deliberation.

### DISPOSITION

The judgment is affirmed.

McINTYRE, J.

WE CONCUR:

BENKE, Acting P. J.

O'ROURKE, J.

8